# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 11, 2017          Decided July 25, 2017

No. 15–3020

UNITED STATES OF AMERICA,
APPELLEE

v.

YONAS ESHETU, ALSO KNOWN AS YONAS SEBSIBE,
APPELLANT

———

Consolidated with 15–3021, 15–3023

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:13–cr–00262–5)
(No. 1:13–cr–00262–2)
(No. 1:13–cr–00262–1)

———

*Carmen D. Hernandez*, appointed by the court, argued the cause for the appellants. *Mary E. Davis*, *Christopher M. Davis* and *Anthony D. Martin*, all appointed by the court, were with her on briefs.

*Peter S. Smith*, Assistant United States Attorney, argued the cause for the appellee. *Elizabeth Trosman*, *Emory V. Cole* and *Karla-Dee Clark*, Assistant United States Attorneys, were with him on brief.

Before: HENDERSON, KAVANAUGH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* MILLETT.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Pablo Lovo, Joel Sorto and Yonas Eshetu were friends. On September 5, 2013, they met an undercover police officer at a Washington, D.C., storage facility in preparation for a robbery. But before departing for the robbery, the police arrested them. The three were tried by a jury and convicted of conspiracy. Lovo and Sorto were also convicted of using, carrying or possessing a firearm during a crime of violence. For the following reasons, we affirm the district court in all but one claim; that one claim is remanded.

## I. BACKGROUND

### THE PLOTTED ROBBERY[1]

At least twice in 2012 and 2013, defendant Lovo helped his friend, Jonathan Avila, obtain drugs to sell to "Santos." Unbeknownst to Lovo, however, Avila was cooperating with law enforcement and "Santos" was Miguel Rodriguezgil, an

---

[1] We draw these facts from the evidence adduced at trial. Lovo presented a different version of the facts which we discuss *infra*.

officer with the District of Columbia Metropolitan Police Department (MPD).

During summer 2013, Rodriguezgil began investigating Lovo for a different crime—conspiracy to rob a liquor store.[2] The plan came into being over the course of several meetings. It began on August 13, when Lovo, Rodriguezgil and Avila met at a Washington, D.C., restaurant. There, Rodriguezgil asked Lovo about his experience with robbery and Lovo responded that he and his "crew" often robbed brothels. Rodriguezgil offered to obtain information about a potential robbery target. They parted ways, agreeing to meet in the days ahead.

A second meeting followed on August 16. This time, Lovo met with Rodriguezgil and Janice Castillo, a special agent with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Castillo posed as a courier for a drug-trafficking organization. Disgruntled because the organization failed to pay her, Castillo proposed robbing its cocaine "stash house." Lovo expressed interest and, again, emphasized his crew's experience robbing brothels.

Rodriguezgil and Lovo made plans to meet a third time and did so on August 24 at another Washington, D.C., restaurant. This time, Lovo was accompanied by his friend, defendant Sorto. Rodriguezgil told the two men that Castillo was meeting with another potential robbery crew in New York because she was worried about Lovo's crew's inexperience. Lovo protested and also volunteered to supply guns for the robbery, including a "TEC-9" semiautomatic pistol. Sorto interjected that he would be armed with a machete. The three continued to discuss the robbery's target and logistics and concluded their meeting with the understanding that

---

[2] 2013 is the year of all relevant actions unless otherwise noted.

4

Rodriguezgil was to inform the others once he received more information from Castillo.

Rodriguezgil and Lovo spoke by telephone several days later. Rodriguezgil proposed meeting so that he could show Lovo a vehicle suitable for the robbery. They met on September 2. Lovo arrived in a Kia; Rodriguezgil in an SUV. Lovo examined it, including a secret compartment Rodriguezgil suggested could hide the guns and the two parted ways. The next time they would see one another was the day set for the robbery.

On the evening of September 5, Rodriguezgil and Lovo met at a storage unit in Northwest Washington, D.C., outfitted to resemble a cocaine-processing facility. Rodriguezgil arrived in the same undercover vehicle as before; Lovo drove his Kia and was accompanied by Sorto, defendant Yonas Eshetu and two other men. Rodriguezgil removed a gun from his person, stored it in his vehicle's secret compartment and told Lovo to do the same. Lovo and Sorto then opened the Kia's trunk but did not retrieve any weapons from it. Instead, they manipulated a bag in the trunk and left it there. Lovo explained to Rodriguezgil that he intended to leave the guns in the Kia because they might use two vehicles in the robbery.

The men then entered the storage facility and Rodriguezgil closed its door behind them. Once inside, Raul Cruz, Jr., another conspirator, demanded to see whether Rodriguezgil was concealing anything under his clothes. Rodriguezgil insisted they do the same and Cruz removed a large butcher knife and a shank from his person. Rodriguezgil again told them they were free to back out but they wanted to proceed. In Rodriguezgil's estimation, Eshetu assumed something of a leadership role, assigning his confederates specific tasks for the robbery. The meeting ended when Rodriguezgil opened the

storage unit gate from within and waiting police officers arrested the defendants.

### THE PROSECUTION, CONVICTION AND POST-TRIAL MOTION

After the arrest, MPD Officer Jason Best drove the Kia to an MPD facility.   There, he searched the car's interior but not its glove compartment or trunk.   He recovered a bag and some black clothing.   An MPD officer drove the car to an ATF facility where it was secured pending a second, more thorough search.   After obtaining a warrant, an MPD officer searched the car on September 6 and recovered, among other items, a TEC-9 and other pistols, wire, ammunition, magazine clips, a facemask wrapper and two long machetes.

On September 12, a grand jury indicted Lovo, Sorto and Eshetu on one count of conspiring to interfere with interstate commerce by robbery, *see* 18 U.S.C. § 1951, and a second count of using, carrying or possessing a firearm during a crime of violence and aiding and abetting that offense, *see* 18 U.S.C. §§ 2, 924(c).[3]   Lovo and Sorto moved to suppress the physical evidence found in the Kia.   The district court denied the motion, concluding that the men lacked a reasonable expectation of privacy in the car and that the police conducted the second search pursuant to a lawful warrant.

Trial began on May 14, 2014.   Rodriguezgil and Castillo testified for the government.   During their testimony, the prosecution played excerpts—often in Spanish—from video and audio recordings of their conversations with the defendants.   Each witness repeatedly described the excerpt's substance without providing a verbatim translation.

---

[3]   Cruz and a fifth defendant, Ariel Flores, were also indicted but both men pleaded guilty.

Lovo also testified, offering a starkly different version of events. He asserted that the August 13 meeting was to discuss potential granite work for "Santos" (Rodriguezgil). But during that meeting, Rodriguezgil supposedly said his girlfriend had a proposed drug transaction she wished to discuss with Lovo. The men therefore arranged a time for Lovo to meet her. Although Lovo concedes the girlfriend—in truth, Castillo—proposed a robbery during their August 16 meeting, he claims to have told Rodriguezgil he was uninterested. But Lovo testified Rodriguezgil nevertheless asked Lovo to sell him weapons and he agreed.

The jury returned its verdict on May 28, 2014. It found Lovo and Sorto guilty on both counts but Eshetu guilty only on the conspiracy charge. In March 2015—nearly ten months after the jury returned its verdicts—Lovo moved for a judgment of acquittal or a new trial, arguing, *inter alia*, entrapment, outrageous government conduct, selective prosecution and various arguments pertaining to 18 U.S.C. § 924(c), the firearm statute Sorto and Lovo were convicted of violating. The district court denied the motion, rejecting it as untimely and largely without merit.

## II. ANALYSIS

Lovo, Sorto and Eshetu raise a number of challenges on appeal. In our view, only four merit discussion.

### *MOTION TO SUPPRESS*

The defendants challenge the district court's denial of their motion to suppress evidence removed from the Kia on September 5. They argue that Best's search—conducted, as it was, without a warrant—violated the Fourth Amendment. We consider the issue de novo, *United States v. Holmes*, 505 F.3d

1288, 1292 (D.C. Cir. 2007), and find no constitutional infirmity.

The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. "Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, th[e] [Supreme Court] has inferred that a warrant must generally be secured." *Kentucky v. King*, 563 U.S. 452, 459 (2011). Nevertheless, this "usual requirement" comes "subject to a number of exceptions." *Birchfield v. North Dakota*, 579 U.S. ___, 136 S. Ct. 2160, 2173 (2016). One is the automobile exception. It permits the warrantless search of a car that is "readily mobile" so long as "probable cause exists to believe it contains contraband[.]" *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam).

We believe this exception covers Best's search. As we have explained before, "all that is required for an automobile to be 'readily mobile' within the meaning of the automobile exception is that it is 'used on the highways, or . . . is readily capable of such use.'" *United States v. Williams*, 773 F.3d 98, 105–06 (D.C. Cir. 2014) (ellipses in original) (quoting *California v. Carney*, 471 U.S. 386, 392–93 (1985)). Lovo drove the Kia to the storage facility. He had driven it to meet Rodriguezgil days before. And Lovo planned to drive it to the robbery. On these facts, its mobility was plain.

Probable cause also existed to search the car. Probable cause, we have said, is "more than bare suspicion but . . . less than beyond a reasonable doubt" or even "a preponderance of the evidence." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016). It is an "objective standard . . . met by applying a totality-of-the-circumstances analysis." *Id.* (internal quotation marks omitted). And probable cause abounded on September 5. Rodriguezgil testified Lovo "had made it clear . . . in all of the prior meetings that they were ready and they were coming armed." Joint Appendix 1091. More than that, Lovo and Sorto had previously spoken about their access to weapons—Lovo boasted of his TEC-9 and Sorto expressed a preference for machetes. Lovo also told Rodriguezgil that he intended to leave guns in the Kia. Under the totality of the circumstances, the officers had probable cause to conduct the September 5th search. *See United States v. Sheffield*, 832 F.3d 296, 305 (D.C. Cir. 2016) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." (internal quotation marks omitted)).[4]

---

[4] The government also contends the defendants lacked standing to contest Best's search. As we have previously said, however, "Fourth Amendment 'standing' . . . has nothing to do with jurisdiction[;]" it is "merely an aspect of the substantive merits of a Fourth Amendment claim[.]" *Sheffield*, 832 F.3d at 303–04.

The defendants also challenged the officer's search of the Kia's trunk, which uncovered multiple weapons. We affirm the district court's denial of the motion to suppress that search as well. At bottom, the defendants' argument reduces to a fact dispute about whether the search warrant was issued before or after the trunk's search and we find no clear error in the district court's finding that the search of the trunk occurred after the warrant issued.

## SECTION 924(C) CONVICTION

Lovo and Sorto also maintain we must vacate their convictions for using, carrying or possessing a firearm during a crime of violence. In their view, the portion of the statutory crime-of-violence definition that affects them—set forth in 18 U.S.C. § 924(c)(3)(B)—is unconstitutionally vague. We disagree. Before we address the merits, we must respond to the government's contention that they have waived the argument.

The government contends Lovo and Sorto cannot attack section 924(c)(3)(B)'s constitutionality now because they failed to do so before trial. For this contention, they rely on Federal Rule of Criminal Procedure 12, which, before December 2014, provided that certain enumerated motions were "waive[d]" if not raised before trial. FED. R. CRIM. P. 12(b)(3), (e) (2013). But the government overlooks important language included in Rule 12: "[A]t any time while the case is pending, the court may hear a claim that the indictment . . . fails . . . to state an offense[.]" *Id.* 12(b)(3)(B). Challenging section 924(c)(3)(B)'s constitutionality undoubtedly qualifies. *See, e.g.*, *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973) ("The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional.").

It is true that this carve-out was deleted in December 2014. But we conclude that deletion—effected *after* their May 2014 trial—does not retroactively foreclose their challenge here. The United States Supreme Court announced that new Rule 12 applies to pending proceedings only "insofar as just and practicable[.]" Supreme Court Order Amending Fed. R.

Crim. P. 12 (Apr. 25, 2014).[5]  And because the operative Rule 12 in May 2014 permitted post-trial attacks on section 924(c)(3)(B)'s constitutionality, we do not think it fair to deem the argument waived.  *See United States v. Bankston*, 820 F.3d 215, 229 (6th Cir. 2016) (It "would . . . be unjust" to prohibit a defendant's invocation of Rule 12's "'failure to state an offense' exception" when pre-amendment Rule 12 "was in effect during [her] trial and when she filed [her] appeal[.]").

Turning to the merits, we conclude Lovo's and Sorto's section 924(c) challenge must fail.  Their argument is rooted in the Fifth Amendment, which guarantees no person shall be "deprived of life, liberty, or property, without due process of law[.]"  U.S. CONST. amend. V.  This provision "prohibits the Government from taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Beckles v. United States*, 580 U.S. ___, 137 S. Ct. 886, 892 (2017) (internal quotation marks omitted).  "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id.* (internal quotation marks omitted).

Section 924(c) generally penalizes using, carrying or possessing a firearm "during and in relation to," *inter alia*, a federally cognizable "crime of violence."  18 U.S.C § 924(c)(1)(A).  Its "residual clause" defines a crime of

---

[5]  The Rules Enabling Act grants the Supreme Court "the power to prescribe general rules of practice and procedure . . . for cases in the United States district courts."  28 U.S.C. § 2072(a).  The High Court is generally permitted to "fix the extent" to which amended rules apply to pending proceedings.  *Id.* § 2074(a).

violence to include any felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* § 924(c)(3)(B). [6] We "ordinarily designate[]" an offense a crime of violence by "looking to [its] statutory definition . . . , rather than the evidence presented to prove it." *United States v. Kennedy*, 133 F.3d 53, 56 (D.C. Cir. 1998). This approach is called the "categorical" approach, *Taylor v. United States*, 495 U.S. 575, 600 (1990), and it is used for other statutes as well.

Lovo's and Sorto's challenge analogizes to one of those statutes—the Armed Career Criminal Act of 1984 (ACCA). *See* 18 U.S.C. § 924(e). The ACCA imposes a heightened minimum sentence on a felon who illegally possesses a firearm and has previously been convicted of three or more qualifying offenses, including a "violent felony." *Id.* § 924(e)(1). The ACCA defines "violent felony" to include "any crime punishable by imprisonment for a term exceeding one year . . . that . . . is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*[.]" *Id.* § 924(e)(2)(B) (emphasis added). The italicized language is also known as the "residual clause."

In *Johnson v. United States*, the United States Supreme Court struck down the ACCA residual clause as unconstitutionally vague. 576 U.S. ___, 135 S. Ct. 2551, 2556, 2563 (2015). The Court explained that "[t]wo features . . . conspire[d] to make it" so. *Id.* at 2557. For one, the ACCA created "grave uncertainty about how to estimate

---

[6] Section 924(c) alternatively defines a crime of violence as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another[.]" 18 U.S.C. § 924(c)(3)(A).

the risk posed by a crime" because it "tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* As the Court explained, the "ordinary instance of witness tampering" could "involve offering a witness a bribe"—but, then again, it could involve threats of violence. *Id.*

The second problematic feature was "uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. The uncertainty stemmed from the ACCA's enumeration of four specific crimes immediately before the residual clause that were meant to "illustrate the kinds of crimes that fall within the statute's scope," *Begay v. United States*, 553 U.S. 137, 142 (2008), and presumably "provide[d] guidance" in determining whether an unlisted offense "presents a serious potential risk of physical injury to another," *Sykes v. United States*, 564 U.S. 1, 8 (2011). In practice, they fell short. The risk inherent in each of the listed crimes was "far from clear." *Johnson*, 135 S. Ct. at 2558 (internal quotation marks omitted). Consequently, the Supreme Court declared the residual clause void for vagueness. *Id.* at 2557.

Lovo and Sorto contend section 924(c)(3)(B) contains the same defects. We conclude it stands on surer footing, however, for several reasons. *First* and most obviously, it contains no "confusing list" of enumerated crimes. *Id.* at 2561. The ACCA list made it *harder* to determine whether a crime described in the residual clause was a violent felony. *See id.* ("The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." (emphasis in original) (internal quotation marks omitted)). Reviewing courts had to "analogiz[e] the level of risk involved

in a defendant's conduct" to crimes that were themselves dissimilar. *United States v. Taylor*, 814 F.3d 340, 377 (6th Cir. 2016). Not here. A court applying section 924(c)(3)(B) need only assess the "substantial risk" of force in a single crime, an easier task.

*Second*, section 924(c)(3)(B) calls for a different sort of risk assessment from that of the ACCA. Unlike the ACCA, which asks whether an offense presents a "potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), section 924(c)(3)(B) requires a "substantial risk that physical *force* . . . may be used in the course of committing the offense[,]" *id.* § 924(c)(3)(B) (emphasis added). "[I]njury" and "force" are very different things. Injury is often a crime's consequence; force, its method of execution. Estimating the risk of physical injury can be difficult. *See Johnson*, 135 S. Ct. at 2558 ("Does the ordinary burglar invade an occupied home by night or an unoccupied home by day?"). But force is often planned. The facts of this case bear witness: Castillo testified that she understood Lovo's robbery plan, as described on August 16, to call for "utiliz[ing] as much . . . force as [his crew] could [muster] in order to make sure that *they* weren't hurt." Joint Appendix 790 (emphasis added). Force, then, was no mere side effect; it was the prescription. This is telling. A court can forecast with relative ease whether a crime "by its nature" presents a "substantial risk" that force "may" be used.

*Third*, section 924(c)(3)(B) contains a temporal limitation not included in the ACCA. Section 924(c)(3)(B) considers the "risk that physical force . . . may be used *in the course of* committing the offense." 18 U.S.C. § 924(c)(3)(B) (emphasis added). The ACCA more broadly asks if the offense "otherwise involves conduct that presents a serious potential risk of physical injury to another[.]" *Id.* § 924(e)(2)(B)(ii).

"[I]n the course of" is important narrowing language. It ensures that a court will confine its analysis to the conduct that constitutes the offense. *See Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004) (language mirroring section 924(c)(3)(B) in different statute "relates *not* to the general conduct or to the possibility that harm will result from a person's conduct, but to the risk that the use of physical force against another might be required in committing a crime"). Determining whether the offense *itself* involves force is far easier than puzzling over a crime's epilogue.

These differences may seem subtle but experience confirms their significance. The Supreme Court noted "repeated attempts and repeated failures to craft a principled and objective standard out of the [ACCA's] residual clause." *Johnson*, 135 S. Ct. at 2558. By contrast, section 924(c)(3)(B) has no such history. *United States v. Hill*, 832 F.3d 135, 148 (2d Cir. 2016). We cannot chalk this up to happenstance. A unanimous Supreme Court determined that driving under the influence of alcohol was not a "crime of violence" under 18 U.S.C § 16(b), a statutory provision nearly identical to section 924(c)(3)(B). *See Leocal*, 543 U.S. at 11. But fewer than four years later, a five-justice majority and a new extratextual test were needed to reach the same conclusion under the ACCA. *See Begay*, 553 U.S. at 145, 148. We think the lesson is clear: Section 924(c)(3)(B) and the ACCA are different statutory provisions whose different words address different conduct. Mindful of our obligation to "accord congressional legislation a presumption of constitutionality," *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1069 (D.C. Cir. 2003) (internal quotation marks omitted), we conclude that section 924(c)(3)(B) does not violate the Fifth Amendment.

We recognize that both residual clauses require a court to employ the categorical approach. Although we also recognize

that "[t]he vagueness of the [ACCA] residual clause rest[ed] in large part on its operation under the categorical approach," *Welch v. United States*, 578 U.S. ___, 136 S. Ct. 1257, 1262 (2016), *Johnson* itself makes clear that the categorical approach was not the only problem. "*Two* features of the [ACCA] residual clause conspire[d] to make it unconstitutionally vague." *Johnson*, 135 S. Ct. at 2557 (emphasis added). As we have explained, section 924(c)(3)(B) lacks at least one—an indeterminate risk analysis. *Johnson* also expressly declined to "jettison . . . the categorical approach" in assessing the ACCA residual clause. *Id.* at 2562. Had the Court thought the categorical approach necessarily produced vagueness, why *not* jettison it? *Cf. Screws v. United States*, 325 U.S. 91, 98 (1945) ("Th[e] [Supreme] Court has consistently favored that interpretation of legislation which supports its constitutionality.").

We must also determine whether section 924(c)(3)(B) classifies conspiracy to commit a Hobbs Act robbery as a "crime of violence." We conclude it does. A Hobbs Act robbery conspiracy has three elements—(1) an agreement to commit Hobbs Act robbery between two or more persons, (2) the defendant's knowledge of the conspiratorial goal and (3) the defendant's voluntary participation in furthering the goal. *In re Pinder*, 824 F.3d 977, 979 n.1 (11th Cir. 2016); *accord United States v. Carr*, 261 F. App'x 560, 563 (4th Cir. 2008); *United States v. Si*, 343 F.3d 1116, 1123–24 (9th Cir. 2003). Ample authority treats a Hobbs Act robbery conspiracy as a crime of violence under the residual clause. *See United States v. Turner*, 501 F.3d 59, 67 (1st Cir. 2007) (collecting cases). Considering the offense's elements, we conclude that makes good sense. As our sister circuit has explained, "[a Hobbs Act robbery] conspiracy, by its very nature, is a collective criminal effort where a common goal unites two or more criminals." *United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996). And

16

"[s]uch a meeting of the minds enhances the likelihood that the planned crime will be carried out." *Id.* "[B]y its nature," therefore, a Hobbs Act robbery conspiracy "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B).[7] Accordingly, we affirm Lovo's and Sorto's section 924(c)(3)(B) convictions.

### VIDEO AND AUDIO RECORDINGS EVIDENCE

The defendants' next challenge focuses on the video and audio recordings of their meetings with law enforcement. The recordings were often in Spanish and unaccompanied by English translations. Nevertheless, they were played for the jury and Rodriguezgil and Castillo testified as to their contents. The defendants contend this was improper because it allowed Rodriguezgil and Castillo to, in effect, summarize the meaning of otherwise unintelligible conversations.

The defendants did not object to the recordings' admission at trial and, so, our review is limited to correcting plain error only. *See* FED. R. CRIM. P. 52(b). "Pursuant to plain error review, an appellant must demonstrate (1) that there was an error, (2) that the error was clear or obvious, (3) that it affected the appellant's substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gooch*, 665 F.3d 1318,

---

[7] Even if we did not use the categorical approach, we would nonetheless conclude that Lovo's and Sorto's offense—as they committed it—was a crime of violence. The men planned a robbery, which crime *necessarily* involves at least a *threat* of force. *See* 18 U.S.C. § 1951(b)(1). They met Rodriguezgil with a car full of weapons. And they repeatedly declared their desire to see the plot through. A "substantial risk" of "physical force against [another] person" plainly inhered in their conduct.

1332 (D.C. Cir. 2012) (citing *United States v. Olano,* 507 U.S. 725, 732–37 (1993)).

Here, we believe the district court erred but not plainly so. Generally speaking, the decision to admit tape recordings "falls within the sound discretion of the trial court." *United States v. White*, 116 F.3d 903, 920 (D.C. Cir. 1997) (per curiam) (internal quotation marks omitted). We have cautioned, however, that a recording must be "authentic, accurate and trustworthy," *United States v. Dale*, 991 F.2d 819, 842 (D.C. Cir. 1993) (per curiam), and "audible and comprehensible enough for the jury to consider the contents," *United States v. Slade*, 627 F.2d 293, 301 (D.C. Cir. 1980). We do not think the untranslated Spanish-language audio sufficed. *See United States v. Gutierrez*, 757 F.3d 785, 788 (8th Cir. 2014) ("[W]here the evidence is a foreign-language recording, the jury usually cannot understand the audio recording."). As other courts have recognized, "[t]ranscripts of recorded conversations are a virtual necessity when the conversations take place in Spanish and are admitted into evidence before an English-speaking jury." *United States v. Nunez*, 532 F.3d 645, 651 (7th Cir. 2008). The district court therefore erred in admitting the audio recordings of the meetings without accompanying English-language transcripts.

Nevertheless, we cannot say the error meets the stringent plain-error standard. *Gooch*, 665 F.3d at 1332. A recording may be incomprehensible for any number of reasons. Flaws like garbled audio are often irremediable. But foreign-language audio is of a different character. It can readily be understood by speakers of that language. And in this case, numerous Spanish speakers testified. Through cross-examination, defense counsel had an opportunity to probe Rodriguezgil's and Castillo's understanding of the recordings' contents. Moreover, the meetings were not conducted

exclusively in Spanish; portions were in English. In addition, the jury had before it *video* footage of certain critical events—among them, Lovo's September 2 inspection of Rodriguezgil's SUV and the September 5 storage-facility meeting.[8]

### INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment guarantees a criminal defendant the right to reasonably effective legal assistance. *Roe v. Flores-Ortega*, 528 U.S. 470, 476 (2000). The defendants contend they were denied this right: *First*, they contend their counsel acted ineffectively in failing to request an entrapment instruction. *Second*, they argue their counsel should have objected to the Spanish-language recordings' admission.

Establishing ineffective assistance of counsel "is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The defendant who succeeds "must show both that counsel performed deficiently and that counsel's deficient performance caused him prejudice." *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 775 (2017). We have described this inquiry as "fact-intensive." *United States v. Rashad*, 331 F.3d 908, 909 (D.C. Cir. 2003). And as the Supreme Court has recognized, the district court is "the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Massaro v. United States*, 538 U.S. 500, 505 (2003). For that reason, on direct appeal we do not ordinarily decide an ineffective-assistance claim in the first instance. *Rashad*, 331 F.3d at 909–10. Instead, our "typical practice" is to remand colorable ineffective-assistance claims to the district court for its consideration. *United States v. Knight*, 824 F.3d 1105, 1112 (D.C. Cir. 2016).

---

[8] We do not think any alleged sound-quality problem with the recordings was serious enough to make their admission plain error.

We follow that course here. Entrapment is a defense comprising "two related elements," *viz.*, "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988). On this record, we do not know *why* defense counsel declined to pursue one. The trial record does not conclusively show the defendants' entitlement *vel non* to relief and we therefore must remand. *United States v. Bell*, 708 F.3d 223, 225 (D.C. Cir. 2013).

So too with the defendants' contention that counsel should have objected to the recordings' admission. The record does not contain sufficient evidence for us to weigh counsel's performance or any resulting prejudice. As our earlier discussion makes clear, we believe an objection to the tapes' admission could have been upheld. But that does not necessarily mean counsel was deficient in failing to object. *Cf. United States v. Vyner*, 846 F.3d 1224, 1227 (D.C. Cir. 2017) ("To establish deficient performance, . . . the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (internal quotation marks omitted)). Nor is the extent of resultant prejudice—if any—clear from the record. We therefore remand for consideration of this challenge as well.[9]

---

[9] Although we have considered the defendants' remaining arguments, we find them without merit. Among other arguments, they contend that the district court should have entered a judgment of acquittal or ordered a new trial because the government's "reverse sting" investigatory technique amounted to selective enforcement. *See* Appellants' Br. 50–52 (citing *United States v. Black*, 750 F.3d 1053 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of rehearing en banc)). When raised in March 2015, this contention was plainly untimely. *See United States v. Whitfield*, 649 F. App'x

For the foregoing reasons, we affirm the car-search, section 924(c) and tape-recordings claims and remand the ineffective-assistance-of-counsel claim.

*So ordered.*

---

192, 196 (3d Cir. 2016) (selective enforcement claim must be raised before trial (citing FED. R. CRIM. P. 12(b)(3)(A) (2013))). On remand, the defendants may argue that their counsel was constitutionally ineffective for failing to timely pursue this argument.

MILLETT, *Circuit Judge*, concurring in part and concurring in the judgment:

I join all of the court's opinion except its analysis of the Defendants' challenge to their convictions under 18 U.S.C. § 924(c). With respect to that issue, I would take a somewhat different path to rejecting the constitutional challenge and to concluding that a Hobbs Act conspiracy to commit robbery qualifies as a crime of violence under Section 924(c).

**A**

As the court's opinion explains, this case arises in the wake of the Supreme Court's holding in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally vague. The question before us is whether the Defendants' convictions under the residual clause of Section 924(c) must meet the same fate. Section 924(c) imposes a mandatory five-year minimum sentence for the use of a firearm in the commission of a "crime of violence." *Id.* § 924(c)(1)(A)(i). The statute then defines "crime of violence" as a federal felony that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) * * * by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3); *see id.* § 924(c)(1)(A) (limiting the provision to federal offenses). The Defendants were convicted under subsection (B), which is commonly referred to as the "residual clause," and they argue that it suffers from the same

vagueness problems that rendered ACCA's residual clause unconstitutional.

In my view, the answer to this question is far closer than the court's opinion indicates. The Achilles' heel of ACCA was that statute's use of the categorical approach. *See Welch v. United States*, 136 S. Ct. 1257, 1262 (2016) ("The residual clause failed not because it adopted a 'serious potential risk' standard but because applying that standard under the categorical approach required courts to assess the hypothetical risk posed by an abstract generic version of the offense."). The Supreme Court concluded in *Johnson* that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." 135 S. Ct. at 2557. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime." *Id.* That is so because the categorical approach "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* Second, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558. Because of that "combin[ed] indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony," ACCA's residual clause "produce[s] more unpredictability and arbitrariness than the Due Process Clause tolerates." *Id.*

We analyze Section 924(c)'s residual clause through that same troublesome categorical lens, *United States v. Kennedy*, 133 F.3d 53, 56 (D.C. Cir. 1998), and that extension of the categorical approach to Section 924(c)'s residual clause plainly enfeebles the constitutionality of that statute for the same two reasons given in *Johnson*. Nevertheless, I conclude that Section 924(c) does not suffer from quite the same amount of

"unpredictability and arbitrariness" as ACCA's residual clause, for four reasons.

*First*, the Supreme Court has suggested as much. That matters to a lower federal court like us. In *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the Supreme Court addressed an indistinguishably worded provision, 18 U.S.C. § 16(b).[1] In holding that Section 16(b)'s "crime of violence" residual clause did not extend to driving under the influence, the Court emphasized the statute's cabined reach, holding that it applies only to "the risk that the use of physical force against another might be required in committing a crime." *Leocal*, 543 U.S. at 10. The Court further explained that, unlike a statute the application of which turns on a risk of injury to third persons (such as ACCA), the "substantial risk" in Section 16(b) "relates to the use of force" "in the course of committing the offense[,]" and "not to the possible effect of a person's conduct*." Id*. at 10 & n.7.

To be sure, the Supreme Court is currently considering a constitutional vagueness challenge to Section 16(b) in the wake of *Johnson*. *See Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), *cert. granted*, 85 U.S.L.W. 3114 (U.S. Sept. 29, 2016) (No. 15–1498). For now, though, *Leocal*'s recognition--that courts may more manageably evaluate the risk of force being used in the commission of a crime than they could an ACCA-like inquiry into the risk of injury to third parties--carries weight in resolving the Defendants' challenge.

---

[1] That provision provides that "[t]he term 'crime of violence' means * * * (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b).

*Second*, unlike ACCA's residual clause, Section 924(c)'s residual clause does not contain a list of comparator crimes. *Compare* 18 U.S.C. § 924(e)(2)(B)(ii) (defining a violent felony as one that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another"), *with* 18 U.S.C. § 924(c)(3)(B) (defining a crime of violence as one "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"). The Supreme Court in *Johnson* was explicit that the enumerated offenses in ACCA's residual clause made things constitutionally worse. *See* 135 S. Ct. at 2558 ("By asking whether the crime '*otherwise* involves conduct that presents a serious potential risk,' moreover, the residual clause forces courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives. These offenses are 'far from clear in respect to the degree of risk each poses.'") (emphasis in original and citation omitted).

Indeed, in distinguishing ACCA's residual clause from the "dozens of federal and state criminal laws [that] use terms like 'substantial risk, 'grave risk,' and 'unreasonable risk," the Court explained that "[a]lmost none of the cited law links a phrase such as 'substantial risk' to a *confusing* list of examples." *Id.* at 2561 (emphasis added). Section 924(c) likewise is not plagued by such an unwieldy list of comparator offenses.

*Third*, the role that the recondite categorical analysis fulfills for Section 924(c) is far more limited than in ACCA because Section 924(c) applies only to federal crimes. *Compare* 18 U.S.C. § 924(e)(1) (explaining that ACCA's sentencing enhancement applies to "a person who violates section 922(g) of this title and has three convictions by *any*

*court referred to in section 922(g)(1)*") (emphasis added), *and id.* § 922(g)(1) ("It shall be unlawful for any person who has been convicted in *any court*") (emphasis added), *with id.* § 924(c)(1)(A) (applying to crimes of violence "for which the person may be prosecuted *in a court of the United States*") (emphasis added). *See also United States v. Gonzalez*, 520 U.S. 1, 5 (1997) ("Congress expressly limited the phrase 'any crime' [in Section 924(c)] to only federal crimes[.]").

As a result, in determining whether there is a substantial risk that physical force will be used in the commission of a crime, federal courts need only to analyze the nature of that particular federal crime; they need not try and discern some sort of cross-jurisdictional common character for an offense that could be articulated fifty different ways by fifty different States, as ACCA required. *See*, *e.g.*, *Sykes v. United States*, 564 U.S. 1 (2011). Section 924(c), in other words, simply does not require courts to overlay a categorical analysis on top of such broad variation in the nature, elements, and contours of the predicate crimes, and courts will confront less variation in how offense conduct is commonly manifested. The courts will also be dealing with a body of federal law with which they are more experienced.[2]

---

[2] Every criminal statute with which the Supreme Court wrestled in its "attempt[s] to discern [the] meaning" of ACCA's residual clause was a state criminal statute. *See Johnson*, 135 S. Ct. at 2556 (involving "Minnesota's offense of unlawful possession of a short-barreled shotgun"); *see also Sykes*, 564 U.S. at 4 (involving "Indiana's 'resisting law enforcement' law"); *Chambers v. United States*, 555 U.S. 122, 124–125 (2009) (involving Illinois' "failing to report to a penal institution" statute) (alteration omitted); *Begay v. United States*, 553 U.S. 137, 140 (2008) (involving New Mexico's driving under the influence of alcohol statute); *James v. United States*, 550 U.S. 192, 195 (2007) (involving Florida's attempted burglary statute).

*Fourth*, determining whether a criminal offense entails a substantial risk that physical force will be used is not an uncommon legal inquiry, and thus there is already jurisprudential scaffolding that gives structure to the Section 924(c) inquiry.  *See* 18 U.S.C. § 3156(a)(4)(B) (defining a "crime of violence" for the purposes of release and detention statutes as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense");  18 U.S.C. § 521 (defining a sentencing enhancement for persons that are members of a criminal street gang and have been convicted within five years of "any Federal or State felony offense that by its nature involves a substantial risk that physical force against the person of another may be used in the course of committing the offense").  Indeed, the Supreme Court in *Johnson* expressed no "doubt [about] the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct," noting that "'the law is full of instances where a man's fate depends on his estimating rightly * * * some matter of degree[.]'"  135 S. Ct. at 2561 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

For those reasons, I conclude that Section 924(c)'s residual clause is not unconstitutionally vague under *Johnson*.

**B**

The court's opinion also holds that Hobbs Act conspiracy to commit robbery qualifies as a crime of violence within the meaning of Section 924(c).  Again I agree, but for somewhat different reasons.

Under this court's precedent, by which this panel is bound, in a Hobbs Act conspiracy, we may look to the object of the conspiracy—either robbery or extortion—to determine if the conspiracy itself is a crime of violence. *See Kennedy*, 133 F.3d at 57–58; *see also United States v. Turner*, 501 F.3d 59, 67 (1st Cir. 2007) ("[T]he object of the conspiracy is the critical determinant of its nature.").

The object of the conspiracy here was robbery, and the Hobbs Act defines its robbery offense as the taking of property from another "by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property[.]" 18 U.S.C. § 1951(b)(1). As such, Hobbs Act robbery itself would seem to be a crime of violence under Section 924(c)'s elements clause, 18 U.S.C. § 924(c)(3)(A), without any need to resort to the residual clause. *See Kennedy,* 133 F.3d at 58. Because the object of the conspiracy necessarily requires force or the threat of force for its completion, an agreement to complete that offense also involves at least a substantial risk that force will be involved. *See United States v. Elder*, 88 F.3d 127, 129 (2d Cir. 1996) ("We have held in several circumstances that conspiracy is itself a crime of violence when its objectives are violent crimes or when its members intend to use violent methods to achieve its goals."); *see also United States v. Brown*, 200 F.3d 700, 706 (10th Cir. 1999) ("We recognize that conspiracy punishes collective criminal agreement rather than the substantive offense. However, at a minimum, an agreement to accomplish the statutory elements of carjacking necessarily involves a substantial risk of physical force against the person or property of a victim[.]") (citation omitted); *cf. Leocal*, 543 U.S. at 10 (explaining that language analogous to Section 924(c)'s residual clause "covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense").

Given this circuit's precedent, I join the court's judgment that conspiracy to commit Hobbs Act robbery is a crime of violence under Section 924(c).