Thompson, Associate Judge, dissenting: My colleagues in the majority are “properly and commendably concerned about the threats to privacy that may flow from advances in the technology available to the law enforcement profession.”[1] I share their concern, but I am not persuaded to their conclusion in this case, which I believe rests on a too-generic description of the facts surrounding use of the cell-site simulator involved here. My colleagues express concern that “[a] cell-site simulator allows police officers who possess a person’s telephone number to discover that person’s precise location remotely and at will.” Ante at 713. But this case is about far more particular and narrow facts, and here, as always, Fourth Amendment analysis must be “extremely fact-specific”;[2] “[i]t is important to be clear about what occurred in this case[.]”[3] . Described with the necessary specificity, this case is about the following: Police had near real-time cell-site location information from cell phone providers[4] that a cell phone, which police knew (from a review of victim call records) had been used by the perpetrator of two recent sexual assaults and related robberies to lure his victims, was traveling on the public streets together with a powered-on[5] Sprint cell phone (the “stolen phone”) that the perpetrator had stolen from one of the robbery victims, and was in the vicinity of the Minnesota Avenue Metro station; and, after driving to the area near that station, law enforcement officers using a cell-site simulator (over a period of 30 to 45 minutes) were led to a row of cars parked on the street near the Metro station and thence to the sole occupied car, in which appellant sat with the stolen cell phone in his possession.[6] I can agree with my colleagues that “under ordinary circumstances,” ante at 714-15, the government’s use of a cell-site simulator to locate an individual through the individual’s cellphone likely violates the legitimate expectation of privacy we all have in our location information.[7]1 would also agree that “individuals have a reasonable expectation of privacy in their location information when they are tracked in a space, like the home, that is traditionally protected or when they are tracked for a longer period of time and in greater detail than society would expect.” Historical Cell Site Data, 724 F.3d at 608 (describing a contention by the ACLU). But I do not believe it is fair to regard the particular circumstances of this case, which I have described above, as “ordinary circumstances.” And as the facts of this case (1) do not involve the privacy of the home;[8] (2) did not entail long-term tracking that could reveal appellant’s private information about the places he frequents;[9] (3) did not entail a physical intrusion or a physical trespass to any property of appellant;[10] and (4) did not involve a search of the contents of appellant’s cell phone that could have exposed his private information,[11] I am unpersuaded that there was a Fourth Amendment violation in this case. In the pages that follow, I will explain my reasoning in more detail. But first, I must address a preliminary issue. I. After oral argument in this matter, this court directed the parties to submit supplemental briefs on the following issue: What reasonable and legitimate expectation of privacy does a person have in his or her location information when the person possesses (outside his or her residence) a stolen cell phone capable of being located by a cell-site simulator or through real-time cell site location, information available to the cell phone owner or his or her telecommunications provider? Asserting that the issue the court raised was waived by the government, appellant argues in his supplemental brief that “waiver rules preclude this court from affirming the trial court’s ruling on an alternative ground that the government did not raise at trial or on appeal.” I disagree in the strongest terms.[12] Fourth Amendment suppression issues are serious issues. In this case, the evidence sought to be suppressed relates to serial sexual assaults and robberies at knifepoint (with use of a knife that the assailant — confirmed by DNA evidence to be appellant — was still carrying on his person at the time he was stopped by police). We have a duty to analyze for ourselves the antecedent question of whether, on the particular facts of this case, use of the technology by which appellant was located constituted a search (and, if so, whether.it was a lawful search). In this case as always, this court’s task is to “consider[ ] the briefs and the oral argument, and [to] test[] them against the record and-the law,” Watson v. United States, 536 A.2d 1056, 1068 (D.C. 1987) (en banc), not merely to choose the better or best of the arguments presented- in support of a claim, Our responsibility as an appellate court is to decide .cases in accordance with the law, and that responsibility is not to be diluted by how counsel have framed the issues or by limitation to the specific authorities counsel have cited. The Supreme Court’s decision in United States National Bank of Oregon v. Independent Insurance Agents of America, Inc., 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), is instructive. That litigation commenced after the Comptroller of the Currency issued a ruling allowing the United States National Bank of Oregon “to sell insurance through its branch in Banks, Oregon.” Id. at 443, 113 S.Ct. 2173. Trade organizations challenged the Comptroller’s decision, arguing,, inter alia, that it was inconsistent with section 92, a statutory provision enacted in 1916 that “permitted] banks located in small communities to sell insurance to customers outside those communities.” Id. at 441, 444, 113 S.Ct. 2173. The District Court granted summary judgment in favor of the Comptroller, finding that “the Comptroller’s interpretation was rational and'consistent with section 92.” Id. at 444, 113 S.Ct. 2173 (internal quotation marks and alterations omitted). On appeal, the trade organizations did not ask the Court of Appeals for the District of Columbia, to rule that section 92 no longer existed (it had been repealed in 1918), and they did not take a position on the issue during oral argument or in supplemental briefing. Nevertheless, reasoning that it had “a ‘duty* to [decide the issue],” the Court of Appeals determined that section 92 had been repealed. Id. at 444-45, 113 S.Ct. 2173 (quoting Indep. Ins. Agents of America, Inc. v. Clarke, 955 F.2d 731, 734 (D.C. Cir. 1992)). The case went to the Supreme Court, which concluded that “[t]he Court of Appeals ... had discretion to consider the validity of section 92,” and “did not stray beyond its constitutional or prudential boundaries” in doing so. Id. at 447, 113 S.Ct. 2173. The Court explained that “[tjhough the parties did not lock horns over the status of section 92, they did clash over whether the Comptroller properly relied on section 92 as authority for his ruling,” and the Court of Appeals was not obliged “to treat the unasserted argument that section 92 had been repealed as having been waived.” Id. at 446-47, 113 S.Ct. 2173. The Court confirmed that “ “when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.’” Id. at 446, 113 S.Ct. 2173 (internal alterations omitted) (quoting Kamen v. Kemper Fin. Servs, Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)).'The Court further instructed that “a court may consider an issue ‘antecedent to and ultimately dispositive of ‘ the dispute before it, even an issue the parties fail to identify and brief.” Id. at 446-47, 113 S.Ct. 2173 (internal alterations omitted) (quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990)). Our court has applied the guidance of National Bank of Oregon in various circumstances. For example, in Martin v. United States, 952 A.2d 181 (D.C. 2008), after requesting supplemental briefs from the parties, we reached the question of whether the police had unlawfully entered Martin’s home in violation of the Fourth Amendment, even though “appellate counsel [had] failed' to argue that the entry itself constituted an unlawful search either in his principal brief or at oral argument.” Id. at 188-89.[13] Our sister court, the United States Court of Appeals for the District of Columbia Circuit, has also considered the merits of issues the parties did not raise. See United States v. Maynard, 615 F.3d 544, 560-61 (D.C. Cir. 2010) (“The Government does not separately raise, but we would be remiss if we did not address, the possibility that although the whole of Jones’s movements during the month for which the police monitored him was not actually exposed to the public, it was constructively exposed because each of his individual movements during that time was itself in public view.”).[14] in short, case law does not bind us to the approach of addressing only the arguments the parties have framed. The Supreme Court has not followed or dictated that approach,[15] our neighbor the United States Court of Appeals for the District of Columbia Circuit has rejected it, and numerous other federal circuit courts of appeals have said that they have discretion on direct appeal to consider arguments a party has failed to make.[16] The bottom line is that appellate courts “regularly and frequently consider sua sponte authorities not cited and grounds of decision not raised.”[17] When we review denials of motions to suppress, “our role is [essentially] to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred.” Brown v. United States, 590 A.2d 1008, 1020 (D.C. 1991). “We must determine whether the court’s denial of the motion to suppress is sustainable under any reasonable view of the evidence,” and “[i]t is well settled that [we] may affirm a decision for reasons other than those given by the trial court.” Alston v. United States, 518 A.2d 439, 440 n.2 (D.C. 1986), Thus, in this case, we have a duty to study carefully the particular facts of the case to determine for ourselves whether the trial court’s denial of appellant’s motion to suppress is sustainable. This means that we have not only the discretion to consider, but an obligation to consider whether appellant had a reasonable and legitimate expectation of privacy in his location information when (as the supplemental briefing order described and among other material facts discussed below) he “possesse[d] (outside his ... residence) a stolen cell phone capable of being located by a cell-site simulator or through real-time cell-site location information available to the cell phone owner or his ... telecommunications provider.” As explained in the discussion below, “the antecedent question of whether there [wa]s a Fourth Amendment ‘search’ at all”[18] turns on resolution of that issue (which,- on the facts presented here, is ultimately dispositive of the case). And even if arguendo use of the cell-site simulator constituted a “search” for Fourth Amendment purposes, application of the automobile ” exception to the Fourth Amendment warrant requirement requires affirmance of the trial court’s denial of the motion to suppress. II. The Fourth Amendment protects “[t]he right of the people: to be secure -in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const. amend. IV. Thus, in analyzing a Fourth Amendment claim, the threshold issue is whether there has been a “search” or “seizure.” That “antecedent question whether or not a Fourth Amendment ‘search’ has occurred is not so simple under [Supreme Court] precedent.” Kyllo, 533 U.S. at 31, 121 S.Ct. 2038. The fundamental principle, however, is that “a Fourth Amendment search does not occur ... unless the individual manifested a subjective expectation of privacy in. the object of the challenged search, and society is willing to recognize that expectation' as reasonable.” Id. at 33, 121 S.Ct. 2038 (internal quotation marks and alterations omitted). “[W]hether an expectation of privacy is reasonable depends in large part upon whether that expectation relates to information that has been ‘exposed to the public.’ ” Maynard, 615 F.3d at 558 (internal alterations omitted) (quoting Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). “In considering whether something is ‘exposed’ to the public as that term was used in Katz[,l we ask not what another person can physically and may lawfully do but rather what a reasonable person expects another might actually do.” Id. at 559. A, Appellant had no reasonable expectation of privacy in his location-while he was on the public roads with the powered-on, stolen cell phone. It appears that police used the cell-site simulator to locate appellant’s phone rather than the stolen phone. However, appellant’s expectation of privacy with respect to the location of his phone need not come into play in our resolution of-this case because appellant exposed that location to discovery by being on the public roads with both his phone and the powered-on, stolen cell phone. Even if appellant generally had a subjective expectation that, information about his cell phone’s location would be private, he could not have .had a reasonable expectation that the location of his cell phone would remain private while he was traveling on the public roads with a powered-on, stolen cell phone. The sexual assaults and robberies in this case occurred in 2013. Well before that time, Apple had introduced the Find My iPhone application (“app”). See In re J.A., No. A-1624-14T2, 2016 WL 763923, *5 n.3, 2016 N.J. Super. Unpub. LEXIS 430, *11 n.3 (Super. Ct. App. Div. Feb. 29, 2016) (noting that “Apple introduced the Find My iPhone feature in 2011” and that, in that case, the Find My iPhone app “allowed police to track J.A. by following the stolen iPhone’s signal to the Shelbourne Lane address within minutes of the robbery”). And indeed in this case, one of the detectives working on the case, Detective Rachel Pulliam, testified that she had “one of the complainant’s information in [her] phone as well [as] in the Find My iPhone app” (and thus was able to “get a general idea of where” she would be going to meet the TSU officers who had located appellant through use of the cell-site simulator). It appears that the detective was referring to her ability to use the Find My iPhone app in an effort to locate the Apple iPhone 4S cell phone stolen from the woman the police referred to as complainant number one’s cousin (who was robbed but not sexually assaulted at .the end of the first of the two incidents involved in this case). As it happened, police in this case tracked the stolen Sprint phone and not that iPhone, but case law is replete with references to iPhone owners or law enforcement officers locating stolen iPhones by using the Find My iPhone app in 2013 or earlier years.[19] The facts caution against assuming that the Find My iPhone app or similar find-my-device apps always pinpoint an address or do so accurately,[20] or that the only method officers used in the reported cases to locate the stolen phones was such an app (and not, for example, the app supplemented with use of a cell-site simulator). But the relevant point is that, in 2013, the public had reason to know that, because of “the ubiquity of ... apps,” [21] it was quite possible for a stolen cell phone to be tracked with precision, even if such efforts were not always successful. Further, even aside from the apps available to cell phone owners, cellular service providers have long been able to supply cell phone locational data in close to real-time,[22] and, as at least one court observed in 2010, the providers’ capabilities were increasing.[23] In 2013, it would have been reasonable to expect that the owner of the stolen cell phone might try to locate it by obtaining cell-site location information from her cellular service provider. Surely “[t]he availability and use of [the foregoing] and other new devices ... shape the average person’s expectations about the privacy of’ cell phone movements and location. Jones, 565 U.S. at 429, 132 S.Ct. 945 (Alito, J., concurring in judgment).[24] Further, it was reasonable to expect that the owner of the stolen cell phone would seek help from the police and put in motion their efforts, with whatever cell-site location information and devices were at their disposal, to locate the stolen phone. As police TSU Sergeant Perkins testified, with the cell phone simulator, “either one [i.e., the stolen phone or appellant’s phone] would have got us to the area [where they found appellant in his car].”[25]- By traveling with the stolen cell phone that was susceptible to all the foregoing fínd-the-phone methods and devices, appellant exposed his location, too. I therefore find it impossible to conclude that appellant could reasonably have expected that his movements and location with the stolen phone in his possession would be private (and thus that he had an “expectation of privacy in his phone’s location”). Moreover, if appellant had such an expectation, I suspect that it is not one that society is prepared — and in my view it is not one that we should be prepared[26] — to recognize as reasonable. To be sure, our cell phones play such a central role in our lives and contain so much of our personal data that we must be vigilant about protecting against government intrusions into cell phone privacy. But the other side of that coin is that — I strongly suspect — a great many people who have had a. cell phone stolen or who fear such a theft are likely to have a strong desire to recover their stolen phones and to be unwilling to recognize as legitimate the locational-privacy interest of a person who is traveling the streets with a stolen phone.[27] I am not the first to observe that “many people may find the tradeoff [between electronic tracking technology and some diminution of privacy] as worthwhile.” Jones, 565 U.S. at 427, 132 S.Ct. 945 (Alito, J., concurring in judgment). To be clear, the 'analysis above does not rely on the inevitable-discovery doctrine to conclude that use of the cell-site simulator was lawful. As the majority opinion notes, the inevitable-discovery doctrine “shields illegally obtained evidence from the éxclu-sionary rule if the government can show, by a preponderance of the evidence, that the evidence ‘ultimately or inevitably would have' been discovered by lawful means.’ ” Gore v. United States, 145 A.3d 540, 548 (D.C. 2016) (quoting Hicks v. United States, 730 A.2d 657, 659 (D.C. 1999)). The inevitable-discovery doctrine thus requires proof that a presumably lawful search process was actually underway; here, at least arguably, that would have entailed at a minimum having entered' the pertinent number of the stolen cell phone (which police had obtained) into the cell-site simulator. There was some, evidence that the TSU officers did that, but, in the trial court’s view, not enough such evidence to enable the government to prove by a preponderance of the evidence that the officers used the cell-site simulator to find the stolen phone rather than appellant’s phone. However, for purposes of my analysis focused on what appellant could reasonably have expected others to do, I have properly relied on what the police could have done with respect to the stolen cell phone (or, it appears, with respect to the cousin’s stolen iPhone) that would have enabled them to locate appellant and his phone. • United States v. Gbemisola, 225 F.3d 753 (D.C. Cir. 2000), illustrates the point. There, law enforcement agents had installed and subsequently monitored an electronic tracking device in á package addressed to the defendant,-which enabled the agents to know if and when the defendant opened the package — -which ’ he did while riding in the back of a taxicab. Id. at 756. Noting that the agents did not see when the box was opened, the D.C. Circuit concluded that no warrant was required for their use of the electronic device that reported when the box was opened because the “decisive issue .., [was] not what the officers saw but what they could have seen.” Id. at 759 (emphasis added). “At any time, the surveillance vehicle could have pulled alongside of the taxi and the officers could have watched Gbemisola through its window. Indeed, the taxi driver himself could have seen the event simply by looking in his rear-view mirror or- turning around.” Id.; see also Maynard, 615 F.3d at 560 (“[I]t was not at all unlikely Gbemisola would be observed opening, a package while- seated in the rear of a taxi[.]”). Thus, the fact that the agents learned what they learned through an electronic device (one presumably not generally. available to members of the public) was not the important factor; the important factor was that they, or someone else, could have learned that the defendant opened the package through lawful means.[28] The same point applies here. Again, police TSU Sergeant Perkins’s testimony (and the trial court’s finding) was that, with the cell-cite simulator, “either [phone] would have got[ten them] to [where they found., appellant in his car].” • In . other words, officers could have found appellant’s location through use of the cell-site simulator targeted at the stolen cell phone that was in his vehicle (the lawfulness of which approach appellant does not challenge, and likely has no standing to chair lenge).[29] The fact that (we presume) police officers actually found appellant’s location by using the cell-site simulator on appellant’s cell phone should not change the Fourth Amendment calculus. B. The (assumed) fact that the police actually used the cell-site simulator as to appellant’s cell phone while it was on the public roads does not provide a basis for finding a Fourth Amendment violation. My colleagues focus, however, on the apparent fact that the police entered the identifying number for appellant’s cell phone into the cell-site simulator and thus used it to locate appellant’s phone rather than the co-located stolen phone. They emphasize that “when it comes to the Fourth Amendment, means ... matter.” Ante, at 713-14 (quoting Maynard, 615 F.3d at 566). But, as the D.C. Circuit explained in Maynard, what matters with respect to the means employed is whether “one’s reasonable expectation of control over one’s personal information would ... be defeated” through that means of information gathering. 615 F.3d at 566. For the reasons already discussed, on the facts of this case, appellant had no reasonable expectation of control over the information about his location while he was on the public roads with the powered-on, stolen cell phone in his possession. Moreover, while the “means ... matter” principle applies a fortiori when it comes to law enforcement efforts to learn about what is contained or is transpiring in a home,[30] the principle applies with much less consistency when what is challenged as a “search” took place on public roads. See Knotts, 460 U.S. at 282, 103 S.Ct. 1081 (explaining that the defendants had no legitimate expectation of privacy that was violated by use of a beeper, pre-installed inside a container of chemicals that the defendant purchased and put in his car, which sent signals to a police receiver and enabled police to track the movements of the car, because police could have tracked the car’s movements by driving behind it); United States v. Patrick, 842 F.3d 540, 545 (7th Cir. 2016) (concluding that because the defendant, located with use of a cell-site simulator, was at the time “in a public place, where he had no legitimate expectation of privacy, [he could] not complain about how the police learned his location.”); see also Gbemisola, 225 F.3d at 759. My colleagues ultimately acknowledge that “certain forms of tracking [in public spaces] ... do not invade a reasonable expectation of privacy.” Ante at 713. What they seem to regard as dispositive is that by using the cell-site simulator, the police “actively induce[d] the phone to divulge its identifying information.” Ante at 713. Judge Farrell sees as the critical fact that with the cell-site simulator, the police TSU officers “commandeer[ed]” appellant’s cell phone, turning it into a “self-investigative” tool. I have several responses. First, for a couple of reasons, I believe the foregoing characterizations somewhat overstate the facts. As one court has noted, “cell phones identify themselves by an automatic process called ‘registration,’ which occurs continuously while the cell phone is turned on regardless of whether a call is being placed.” Tracey, 152 So.3d at 507 n.1.[31] That observation accords with the testimony by defense telecommunications technology expert Ben Levitan in this case. See Levitan Aff. 5 (“When a phone attaches itself to a cell tower, it identifies itself by phone number and various codes.”). In other words, identifying themselves constantly is what powered-on cell phones do, regardless of whether a cell-site simulator is in the area. Second, while the majority opinion accurately quotes TSU Sergeant Perkins’s testimony that the cell-site simulator “grabs [the target cell phone] and holds on to it for a minute,” the opinion does not recount Sergeant Perkins’s additional explanation. Sergeant Perkins explained that “by grabs it,” he meant that the cell site simulator “just knows it’s there,” much as one knows when he has arrived at a station he is looking for by scanning the radio dial. Mr. Levitan put it differently, explaining that cell phones “generally connect themselves to the strongest cell tower signal that they detect,” and, in that vein, when a cell phone detects the cell-site simulator as having the strongest signal, it will “break its connection with the cell phone network and reattach itself to the newly found ,,. simulator.” The Department of Justice document entitled “Dep’t of Justice Policy Guidance: Use of Cell-Site Simulator Technology (Sept. 3, 2015), http://www. justiee.gov/opa/fíle/767321/download (the “DOJ Policy Guidance”), states similarly that “cellular devices in the proximity of the [cell-site simulator] identify the simulator as the-most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.” Id. at 2.' Thus — if it matters — it appears that it is cell phones that initiate contact with a cell-site simulator and not the other way around.[32] In any event, my colleagues raise points that must be addressed when they emphasize that by using the cell-site simulator, the TSU officers took “functional control” of and “coopted [appellant’s] phone, forcing it to do something [he] surely never intended it to do: reveal its identifying and location information to an entity other than a telecommunications provider.” Ante, at 716 n.27. Judge Farrell finds it “unpersuasive” “to argue that appellant had no reasonable expectation of privacy in the police’ use of his phone” for this purpose. Ante, at 726. One major problem for my colleagues’ analysis, however, is that, as shocking or outrageous as the foregoing characterizations might sound, the officer’s use of the cell-site simulator did not constitute a “search” and thus was not a Fourth Amendment violation unless appellant had a reasonable and legitimate expectation of privacy with respect to the object of the challenged search: his location information. For the reasons already discussed, he did not while he was on the public roads with a trackable, stolen cell phone. It is helpful to recall the facts of California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). In Greenwood, a police detective asked the regular trash collector in Greenwood’s neighborhood to pick up the plastic garbage bags that Greenwood had left on the curb in front of his house and to turn the bags over to the detective without mixing their contents with garbage from other houses. Id. at 37, 108 S.Ct. 1625. The trash collector responded by cleaning his truck bin of other garbage, collecting the garbage bags from the street in front of Greenwood’s house, and turning the bags over to the detective. Id. The detective searched through the trash and found items indicative of narcotics use. Id. at 37-38, 108 S.Ct. 1625. The Greemvood respondents asserted “that they had, and exhibited, an expectation of privacy with respect to the trash that was searched by the police,” emphasizing that the trash had been placed on the street for collection at a fixed time and was contained in opaque bags, which the garbage collector was expected to pick up, mingle with the garbage of others, and deposit at the garbage dump. Id. at 39, 108 S.Ct. 1625. The respondents also highlighted that “there was little likelihood that [the trash] would be inspected by anyone.” Id. The Supreme Court acknowledged that “[i]t may well be that respondents did not expect that the contents of their garbage bags would become known to the police or other members of the public,” id. at 39, 108 S.Ct. 1625, but reasoned nevertheless that the police conduct did not constitute a Fourth Amendment violation (because respondents “could have had no reasonable expectation of privacy in the inculpatory items that they discarded”). Id. at 41, 108 S.Ct. 1625. In my view, the intrusive police conduct in Greenwood, by which police officers converted thé entire contents of respondent’s trash into a database of information about his activities, was every bit as objectionable as the temporary “coopt[ing]” of appellant’s ' cell phone. I suspect most of us would be outraged at the effrontery of law enforcement officials in systematically inspecting our. trash. But that would not be enough to establish that police officers’ systematic rummaging' through our trash is a “search” for Fourth Amendihent purposes.[33] And any sense of outrage here is likewise not enough to establish that use of the cell-site simulator in the particular circumstances of this case violated appellant’s Fourth Amendment rights.[34] But even if we assume that the TSU officers’ taking “functional control” of and “coopt[ing] [appellant’s] phone” was a search and/or seizure for Fourth Amendment purposes, there is yet another consideration that, in my view, should preclude the court from concluding that the search/seizure was unlawful.[35] The police TSU officers could reasonably infer that the stolen cell phone and appellant’s phone were traveling together in a car or other vehicle because the real-time location information showed them as having gone from Capitol Heights, Maryland, to Kenil-worth Avenue, before moving to the 4000 block.of Minnesota Avenue, N.E. The automobile exception to the Fourth Amendment warrant requirement “permits the warrantless search of a car [or other vehicle] that is ‘readily mobile’ so long as ‘probable cause exists to believe it contains contraband.’ ” United States v. Eshetu, 863 F.3d 946, 951 (D.C. Cir. 2017) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (per curiam)); United States v. Shackleford, 830 F.3d 751, 753 n.2 (8th Cir. 2016) (“The. automobile exception requires probable cause to believe contraband or evidence of any crime will be found in the vehicle[.]”).[36] And, “[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.” United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); Eshetu, 863 F.3d at 952. “Probable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched.” United States v. Charles, 801 F.3d 855, 860 (7th Cir. 2015) (internal quotation marks omitted). Here, even before using the cell-site simulator, the police TSU officers had near real-time cell-site location information that gave them probable cause to believe that a vehicle was on the public roads with both the stolen cell.phone and the cell phone used by the sexual assault/robbery perpetrator, and thus probable cause to believe that — whatever the subject vehicle’s precise location.on the roads[37] — it contained contraband and evidence of a crime. This means that — under the automobile exception — the vehicle was searchable without, a warrant, and that any cell phones in it that might have been contraband or evidence of the crime could be seized.[38]. We should therefore hold that when the cell-site simulator simultaneously detected/caught the signal from appellant’s cell phone (which was located in a car parked on the street) and “seized” the phone by “holding] on to it for' a minute,” there was no Fourth Amendment violation. Any locational information obtained from the cell phone was not content that could be searched only pursuant to a warrant.[39] [[Image here]] I end by repeating and underscoring that my dissent rests on the particular facts of this case: Police had near real-time information, from cell phone providers, that the cell phone the robbery/sexual assault assailant had used to lure his victims was traveling on the public streets together with a trackable, powered-on cell phone stolen from one of the assailant’s victims (who gave the police permission to obtain her phone records); they could infer that the phones were traveling together in a car or other vehicle; and law enforcement officers’ use of a cell-site simulator in the vicinity led them to a “handful of cars” parked at the Minnesota Avenue Metro station and to a car in which appellant sat with the stolen cell phone in his possession. To hold that the officers’ use of the cell-site simulator in this case was lawful would come nowhere close to holding, as my colleagues conclude, that police may use cell-site simulators “at will” to locate any individual who is carrying a cell phone, without regard to whether the individual is known to be in a vehicle moving through the public streets and without regard to whether the individual is known to have with him in the vehicle both a trackable cell phone stolen during a set of robberies and the cell phone from which an assailant placed calls to lure his sexual assault/robbery victims. Quite the contrary, the holding I believe is the right one would, because of its nuaneed analysis, sound a cautionary note about using a cell-site simulator in other circumstances without a warrant.[40] What we should not do in resolving this appeal is to jump on the bandwagon of decrying what is claimed to be a Fourth Amendment violation from use of cell-site-simulator technology without recognizing how the particular, material facts of this case distinguish it from the cell-site simulator eases courts have decided before this one. The Supreme Court has recognized the need for “consideration of case-specific exceptions to the warrant requirement”; [41] we are remiss if we do not carefully consider the distinguishing facts of this case; and the public deserves no less from us, even as we do what we must to protect precious Fourth Amendment rights. For all the foregoing reasons, I respectfully dissent from the judgment reversing appellant’s convictions of two counts of first-degree sexual abuse while armed, two counts of kidnapping while armed, four counts of robbery while armed, and one count of threats. . Kyllo v. United States, 533 U.S. 27, 51, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (Stevens, J., dissenting). . In re Application of United States for Historical Cell Site Data, 724 F.3d 600, 603 (5th Cir. 2013) (internal quotation marks omitted). . United States v. Jones, 565 U.S. 400, 404, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). . As the majority opinion notes, ante at 712 n.20, appellant has not argued in this appeal that his Fourth Amendment rights were violated when the government obtained cell-site location information from cellular providers. See United States v. Graham, 824 F.3d 421, 428 (4th Cir. 2016) (joining other circuit courts in holding that “individuals do not have a reasonable expectation of privacy in historical [cell-site location information] that the government obtains from cell phone service providers”). . Police Technical Services Unit (“TSU”) Sergeant Perkins testified at the suppression hearing in this case that, as long as it’s "powered on,” a cell phone "is constantly transmitting to and receiving from a tower.” . Actually, at the time appellant was arrested, he had in his car all four stolen cell phones involved in this case. . I acknowledge that some courts have so held. See, e.g., United States v. Ellis, No. 13-CR-00818 PJH, 2017 WL 3641867, at *6, 2017 U.S. Dist. LEXIS 136217 *20 (N.D. Cal. Aug. 24, 2017) ("[C]ell phone users have an expectation of privacy in their cell phone location in real time and ... society is prepared to recognize that expectation as reasonable.”). .That fact distinguishes this case from cell-site simulator cases on which appellant relies. See State v. Andrews, 227 Md.App. 350, 134 A.3d 324 (2016), and United States v. Lambis, 197 F.Supp.3d 606, 609 (S.D.N.Y. 2016). In Andrews, police used a cell-site simulator to locate Andrews, who was’ wanted on charges of attempted murder, and tracked him to a location inside a residence, where he was arrested. 134 A.3d at 326, The court cited its concern that the cell-site simulator had “been used to obtain information about the contents of a home, not otherwise discernable without physical intrusion.” Id. at 349. The court stated that “people have a reasonable expectation that their cell phones will not be used as real-time tracking devices by law enforcement” and "an objectively reasonable expectation of privacy in real-time cell phone location information.” Id. at 327. In Lambis, the Drug Enforcement Administration used a cell-site simulator to locate Lambis’s apartment, conduct that the court found to be an unreasonable search because “[t]he home has special significance under the Fourth Amendment.” 197 F.Supp.3d at 609-10. These cases are consistent with the principle that, “[w]ith few exceptions, the question whether a warrant-less search of a home is reasonable and hence constitutional must be answered no." Kyllo, 533 U.S. at 31, 121 S.Ct. 2038 (observing that “[a]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" (internal quotation marks omitted)). In this case, the cell-site simulator alerted the officers that appellant’s phone was located in the 4000 block of Minnesota Avenue, N.E., a block on which there were several businesses, a District of Columbia government building, and a Metro station. There appears to be no evidence in the record that there were residential buildings in the block, but amici note that a large apartment building is also located on the block, at 4020 Minnesota Avenue. There appears to be no evidence in the record that the cell-site simulator came within range of that apartment building as the officers were "coming down southbound Minnesota [Avenue]," . See Graham, 824 F.3d at 435 (noting that in Jones, "the concurring justices recognized a line between ‘short-term monitoring of a person’s movements on public streets,' which would not infringe a reasonable expectation of privacy, and ‘longer term GPS monitoring,’ which would” (quoting Jones, 565 U.S. at 430, 132 S.Ct. 945)), The concern is that long-term historic location information can reveal “a wealth of detail about [an individual's] familial, political, professional, religious, and sexual associations.’’ Jones, 565 U.S. at 415, 132 S.Ct. 945 (Sotomayor, J., concurring); id. at 430, 132 S.Ct. 945 (Alito, J., concurring,in judgment) (”[T]he use of longer term GPS monitoring [over a period of twenty-eight days in Jones’s case] in investigations of most offenses impinges on expectations of privacy.’’); cf. United States v. Riley, 858 F.3d 1012, 1013 (6th Cir. 2017) (tracking of fugitive’s real-time GPS location data for approximately seven hours did not. amount to a Fourth Amendment search). . A trespa.ssory search implicating the Fourth Amendment occurs when the government “gains evidence by physically intruding on constitutionally protected areas." Florida v. Jardines, 569 U.S. 1, 16, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). Appellant and the majority opinion cite cases suggesting that use of a cell-site simulator could constitute trespass to chattels, ante at 716-17 n.27, but my colleagues do not rely on that case law for their conclusion. Moreover, as Justice Alito noted in his concurrence in the judgment in Jones, '"today there must be some actual damage to the chattel before [an] action [for trespass to chattels] can be maintained.” 565 U.S. at 419 n.2, 132 S.Ct. 945 (Alito, J., concurring in judgment) (internal quotation mark's omitted); see also Restatement (Second) of Torts § 218 cmt. (e) (1965) (stating that, generally, "one who intentionally intermeddles with another’s chattel is subject to liability only if his in-termeddling is harmful to the possessor’s materially valuable interest in the physical' condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time"). If arguendo use of the cell-site simulator in this case (which, according to the evidence, may have caused calls that appellant tried to initiate to be dropped) did constitute a trespass, I do not believe we could reasonably conclude that the police were culpable in failing to recognize it as such (and thus I believe we would have no occasion to apply the exclusionary rule). See Herring v. United States, 555 U.S. 135, 141, 143, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (confirming that "exclusion has always been our last resort, not our first impulse” and that the Court has “never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence,”' and stating that ”[t]he extent to which the exclusionary rule is justified ... varies with the culpability of the law enforcement conduct.”) (internal quotation marks omitted). And, as discussed infra, even if police interfered with the operation of appellant’s "chattel” when the cell-site simulator "grabbed” his cell phone remotely and rendered it temporarily non-operational for making calls, police were justified in. effecting that seizure of appellant's cell phone under the automobile exception to the warrant requirement. . "[C]oncerns about a general 'erosion of privacy’ with respect to cell phones ... revolve around protecting the large quantity of information stored 'on modem cell phones and on remote servers like the ‘cloud.’ If all that information were indeed at risk of disclosure [through the government’s obtaining cell-site location information], we would share this concern." Graham, 824 F.3d at 434 n.13 (internal citation omitted). Documents, however, "stored on phones and remote servers are protected, as ‘content,’ in the same way that the contents of text messages or documents and effects stored in a rented storage unit or office are protected.” Id, . Appellant is also incorrect in suggesting that the court directed briefing on an issue entirely absent from the government’s initial brief in this court and its arguments in the trial court, The government argued in its opening brief to us that in cases cited by appellant, “the cell-site simulator located the defendant’s phone inside a home, thus implicating Fourth Amendment privacy concerns .not raised here.” Our inquiry about the significance of the fact that appellant possessed the stolen cell phone outside his residence reflected in part that argument, Our inquiry also reflected the prosecutor’s repeated argument (to which she mistakenly referred as involving application of the "inevitable discovery" doctrine) to the trial court that suppression was not warranted because there was "a separate, lawful way [police] could have gotten'to the same thing” (emphasis added) — i.e., use of the cell-site simulator to target the stolen cell phone that was traveling with appellant’s phope. . See also Anthony v. United States, 935 A.2d 275, 282 n.10 (D.C. 2007) (“But no matter whose ox is gored when the parties are directed by the court to file supplemental submissions, 'this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision.’ ” (quoting Randolph v. United States, 882 A.2d 210, 226 (D.C. 2005)); Outlaw v. United States, 632 A.2d 408, 410-11 (D.C. 1993) (declining to reach the question briefed by the parties — "whether one may be convicted of being an accessory after the fact to murder on the basis of actions taken while the decedent was still alive” — and instead, after requesting and receiving supplemental briefing, ruling based on an issue the panel raised for the first time at oral argument— "whether the evidence was sufficient to'support [appellant’s] conviction of [accessory after the fact] to any offense whatever”); cf. Randolph, 882 A.2d at 217-18 (' "Once a claim is properly presented to the trial court, a party can make any argument in the appellate court in support of that claim[, and] parties are not limited to the precise arguments made below.' ” (internal alterations omitted) (quoting West v. United States, 710 A.2d 866, 868 n.3 (D.C. 1998)); see also id. at 227 (determining that "the judgment should be affirmed on harmlessness grounds, notwithstanding the government's initial failure to argue that the trial court’s error was harmless”). . See also Lesesne v. Doe, 712 F.3d 584, 588 (D.C. Cir. 2013) (noting that the Supreme Court "has recognized that 'there may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below,’ ” and determining that "the proper interpretation of [the Prison Litigation Reform Act’s] exhaustion requirement is a dispositive legal issue antecedent to its application” (internal alterations omitted) (quoting Hormel v. Helvering, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037 (1941))); United States v. Pryce, 938 F.2d 1343, 1348 (D.C. Cir. 1991) ("Only if one adopts an absolutist approach to the adversary system can one contend that courts must never address unargued issues, no matter how obvious their proper resolution may be. Certainly the Supreme Court rejects such an approach.”). . Commentators have frequently mentioned that in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the issue the Court resolved — whether "in diversity cases the substantive law of the state of trial must be applied” — “had not been raised by the parties before either the lower courts or the Supreme Court.” Albert Tate, Jr., Sua Sponte Consideration on Appeal, 9 Trial Judges J. 68 (1970), reprinted in Appellate Judicial Opinions 128 (Robert A. Leflar ed., 1974); see also Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule.”). . See, e.g., United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997) ("We join several other circuit courts of appeals in holding that appellate courts have the discretion on direct appeal to overlook the government's failure to argue that the admission of the challenged evidence, if error, was harmless, and that appellate courts may therefore consider the issue of harmlessness sua sponte.”) (collecting cases). . Albert Tate, Jr., supra note 15, at 127; see also Estate of Girard v. Laird, 159 Vt. 508, 621 A.2d 1265, 1268 n.3 (1993) (citing the Tate article in explaining why the court may "reach[] results for reasons different than those argued by the parties”); State v. Weber, 163 Wis.2d 116, 471 N.W.2d 187, 199 n.7, 200 (1091) (citing the Tate articlé in justifying its' decision upholding the reasonableness of a search under the Fourth Amendment on grounds that, according to the dissenting justice, the State "was aware of ... but did'not argue ... in this court”). . Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 63 (1st Cir. 2004). . See, e.g., People v. Easton, No. H041704, 2017 WL 393263, *2 2017 Cal. App. Unpub. LEXIS 644, *5 (Jan. 30, 2017) (“Using the Find My iPhone application [in 2012], police recovered Casey’s cell phone from a recycling bin in front of a residence in Santa Clara within a few blocks of defendant’s residence.”); State v. Copes, 454 Md. 581, 165 A.3d 418, 422 n.4 (2017) (citing a November 2011 publication entitled "How to Use Find My iPhone to Get Your Stolen iPhone Back”); People v. Foy, 245 Cal.App.4th 328, 199 Cal.Rptr.3d 208, 212 (2016) ("Wang had an application on his iPhone called ‘Find My iPhone,’ which he used [in 2011] at the suggestion of police to track' Song’s stolen iPhone'. Wang's phone displayed a map indicating that Song’s phone was located at 603 Grant Streetf.]”); People v. Robinson, No. 3268/2013, 50 Misc.3d 1224(A), 2016 WL 853803, *1, 2016 N.Y. Misc. LEXIS 652 *3 (App. Div. Feb. 24, 2016) ("As they were driving [in 2013], the Find My iPhone’ tracker showed the [stolen] phone to be moving. The movement stopped at East 120th Street and First Avenue, in Manhattan.”); People v. Snyder, No. B265391, 2016 WL 6777819, *1, 2016 Cal. App. Unpub. LEXIS 8230, *2 (Nov. 16, 2016) ("Using another device’s ‘find my iPhone’ feature [in 2013], Jordyn tracked her iPhone’s location to the Mentor Court residence.”); People v. Scales, No. B260902, 2016 WL 1057108, *3, 2016 Cal. App. Unpub. LEXIS 1942, *7-8 (Mar. 17, 2016) ("[A] Los Angeles Police Department ... Officer ... used a ‘Find My iPhone App’ [in 2012] to locate Schulz’s cell phone that had been taken during the robbery events. It was found on the-side of the 10 Freeway about two miles away from the Green Path building.”); Adams v. State, No. 1142, 2016 WL 483493, *1 n.3, 2016 Md. App. LEXIS 457, *3 n.3 (Ct. Spec. App. Feb. 5, 2016) ("Because Myers’ cell phone was inside his [stolen] vehicle, police [in 2013] were able to locate the car by tracking the phone by use of the 'find my iPhone' application.”); Commonwealth v. Gil, No. 566-EDA-2014, 2015 WL 7575708, *1, 2015 Pa. Super. Unpub. LEXIS 3695, *2 (Feb. 10, 2015) ("After the victim reported the robbery [in 2012], the police tracked the iPhone, through a ‘Find My iPhone' mobile application, to a house on Washington Street.”); State v. Coleman, No. W2012-00880-CCA-R3-CD, 2013 WL 12185234, *1, 2013 Tenn. Crim. App. LEXIS 573, *3 (June 10, 2013) (“Mr. Petty recalled that there was an application on his wife’s phone called ‘Find My iPhone.’ Mr. Petty was able to use his computer to track the phone’s location to a general vicinity of Division and Waddell Street.”); Pirozzi v. Apple, Inc., 966 F.Supp.2d 909, 915 (N.D. Cal. 2013) (quoting a statement from Apple’s website that “In the event your iPhone is lost or stolen, Find My iPhone allows you to locate it on a map[.]”); United States v. Flores-Lopez, 670 F.3d 803, 808 (7th Cir. 2012) (referring to the Find My iPhone app). . Detective Pulliam testified that the Find My iPhone app showed her “[not] an exact, pinpointed location” but, at one point, “a general area ... in southeast” (perhaps the area of the District into which the phones traveled when, according to other evidence, they left Capitol Heights, Maryland, and headed toward Kenilworth Avenue). . Commonwealth v. Wilson, No. 15-P-851, 89 Mass.App.Ct. 1120, 2016 WL 1728900, *1, 2016 Mass App. Unpub. LEXIS 466, *3 (Apr. 29, 2016). . The evidence in this case showed that the police TSU received updated location information from the cellular service providers at least every fifteen minutes (every five minutes for the stolen Sprint phone), with only a one-to-three-minute lag time. . The following observations made by that court in 2010 are notable: “Neither the user nor the carrier can predict how precise the next location data will be. For a typical user, over time, some of that [location] data will likely have locational precision similar to that of GPS”; “Emerging versions of the technology are even more precise”; “[T]he tech-sawy user may now understand that there is a risk that the provider can calculate and record his location and movements very precisely.” In re Application for United States for Historical Cell Site Data, 747 F.Supp.2d 827, 833-34, 845 (S.D. Tex. 2010), rev’d on other grounds, 724 F.3d 600 (5th Cir. 2013). . Such considerations led the Second Circuit to observe that “any expectation of privacy that [the defendant] had in his cell-phone location [tracked over a less-than-two-hour period] was dubious at best." United States v. Caraballo, 831 F.3d 95, 105 (2d Cir. 2016). See generally United States v. Wheeler, 169 F.Supp.3d 896, 908 (E.D. Wis. 2016) (noting that “[t]he media is rife with information and sometimes warnings — about the fact that one’s location can be tracked from one's cell phone”). . Appellant suggests that the evidence indicated that the cell-site simulator did not work with the stolen cell phone, but the trial court declined to so find. The court found instead that if the TSU officers “had ... switched over ... to use the Sprint number instead, ... they would have eventually gotten to the exact same place because the phones were together.” . I have in mind the caution that where we may have been " 'conditioned' by influences alien to the well-recognized Fourth Amendment freedoms, a normative inquiry may be necessary to align” what we are prepared to recognize as legitimate privacy interests “with the protections guaranteed in the Fourth Amendment.” Tracey v. State, 152 So.3d 504, 525-26 (Fla. 2014). . • My conclusion that appellant was traveling with a stolen phone as to which he had no locational-privacy interest does not depend on the juiy verdict that he was the thief, i.e., the perpetrator of the robberies. Cf. Godfrey v. United States, 414 A.2d 214, 214 (D.C. 1980) ("The real question is whether the [proponent of a motion to suppress] can be deemed to have a legitimate expectation of privacy in the thing or area searched and the item seized without reference to” an "unfortunate pretrial connotation that the proponent of the motion to suppress is guilty.”) Rather it rests on the evidence presented at the suppression hearing that, when arrested, appellant had with him in his car ⅝11 four stolen phones as well as the phone used by the perpetrator of the robberies and sexual assaults. (Unlike the defendant in McFerguson v. United States, 770 A.2d 66 (D.C. 2001)—a case Judge Farrell suggests is apposite, ante at 728-29 n.2 — appellant was not “a street pedestrian [with] a reasonable expectation of privacy in covered objects associated with his person,” id. at 71). I believe we can say with confidence that even if appellant had disputed at the suppression hearing that he knew that the victims’ (four) phones found in his possession had been stolen and had attempted to show that he had a legitimate possessory interest in and expectation of privacy with respect to the stolen Sprint phone, he would not have been able to carry his burden of so demonstrating. See Rakas v. Illinois, 439 U.S. 128, 130 n.1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.”); Morton v. United States, 734 A.2d 178, 182 (D.C. 1999) (referring to defendant’s "burden of showing that he had a protectible interest”). . It might be suggested that the analysis in Gbemisola is a straightforward application of the Supreme Court’s ruling in United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), about the lawfulness of use of a monitoring device that reveals no more than could be seen by visual surveillance. See id. at 282-84, 103 S.Ct. 1081 (holding that the officers’ conduct in monitoring signals from a beeper they had installed in a container the defendant subsequently placed in his car did not invade any legitimate expectation of privacy and did- not constitute a Fourth Amendment search since the beeper surveillance revealed no more- than could have been visible to the naked eye as the car traveled the public highway and raised no constitutional issues that visual surveillance would not also raise); see also United States v. Karo, 468 U.S. 705, 714, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (“[T]he monitoring of a beeper in a private residence, a location not open to visual surveillance, violates the Fourth Amendment rights of those who have a- justifiable interest in the privacy of the residence.'"') (emphasis added). However, the Supreme Court’s decision in Bond v. United States, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), makes clear that what an individual exposes to the public is not limited to what can be learned through visual perception (outside a residence), but also includes what members of the public may be able to discern through predictable tactile actions. See id. at 338, 120 S.Ct. 1462 (“When a bus passenger places a bag in an overhead bin, he expects that other passengers or bus employees may move it for one reason or another, Thus, a bus passenger clearly expects that his bag may be handled” and- "exposed to certain kinds of touching and handling,”). I see no reason why the analysis of whether something is exposed to the public based on "what a reasonable person expects another might actually do,” Maynard, 615 F.3d at 559, should not include as well the find-my-stolen-phone efforts likely to be set in motion by an individual whose cell phone has been stolen. . See Lucas v. United States, 411 A.2d 360, 363 (D.C. 1980) (”[I]t is not so clear that persons can always assume that the right to privacy extends to articles of contraband in their possession.”); United States v. White, 504 Fed.Appx. 168, 172 (3d Cir. 2012) (citing authority from several federal circuits that one who knowingly possesses a stolen item has no legitimate expectation of privacy with respect to it and no standing to challenge a search of it). . See, e.g., Kyllo, 533 U.S. at 35 n.2, 121 S.Ct. 2038 (analyzing whether use of a thermal-imaging device, capable of detecting the ' amount of heat emanating from a home, constituted an unlawful search when, without a warrant, it was aimed at the home of an individual suspected of growing marijuana in ■his home using high-intensity lamps; reasoning that the "comparison of the thermal imaging to various circumstances in which outside observers might be able to perceive, without technology, the heat of the home — -for example, by observing snowmelt on the roof — is quite irrelevant. The fact that equivalent information could sometimes be obtained by other means does not make lawful the use of means that violate the Fourth Amendment” (internal citation omitted)), . See also Copes, 165 A.3d at 422-23 ("A cell site simulator ... takes advantage of the fact that a cell phone — when turned on — constantly seeks out nearby cell towers, even if the user is not making a call ... When the cell site simulator is close enough, the target phone will connect to it as though it were a cell tower.”); In re Application for Tel. Info. Needed for a Criminal Investigation, 119 F.Supp.3d 1011, 1014 (N.D. Cal. 2015) (‘‘[C]ell phones, when turned on and not in airplane mode, are always scanning their network’s cellular environment. In so doing, cell phones periodically identify themselves to the closest cell tower — i.e., the one with the strongest radio signal — as they move throughout their network's coverage area. This process [is] known as ‘registration’ or ‘pinging[.]' ... Pinging is automatic and occurs whenever the phone is on, without the user’s input or control.” (record citations omitted)). . But see Andrews, 134 A.3d at 340 (citing testimony in that case that a cell-site simulator known as the Hailstorm "is an active device that can send an electronic signal ... and ‘draw[ ] the phone to [the] equipment’ ” (alteration in original)). My colleagues also say that the cell-site simulator "exploits a security vulnerability" of cell phones. Ante at 713. I would not call what happened here as exploitation of a cell phone security flaw, but as law enforcement's taking advantage of a security-enhancement feature that aids in the recovery of stolen or lost phones, It may place a person who is traveling on the roads with a powered-on, stolen cell phone (that circumstances show he knew to be stolen) in the position either of accepting the risk that at any moment the stolen cell phone or his own cell phone could be converted into a tracking device or, alternatively, turning the phones off, but I do not see why that is an improper choice to foist on the person. . Cf. Historical Cell Site Data, 724 F.3d at 615 ("We understand that cell phone users may reasonably want their location informa- ' tion to remain private, just as they may want their trash, placed curbside in opaque bags, ... to remain so. But the recourse for these . desires is in the market or the political process .... The Fourth Amendment, safeguarded by the courts, protects only reasonable expectations of privacy,” (internal citation . omitted)). . Another lesson from Greenwood is the principle on which Gbemisola, was decided: that if the individual does not have a reasonable expectation of privacy in the object of an activity that we would describe in ordinary parlance as a search, there is no search for Fourth Amendment purposes even if the manner in which law enforcement conducted ’ their garbage inspection was not available to most members of the public. The Supreme Court observed in Greenwood that the respondents' trash was readily accessible to "animals, children, scavengers, snoops, and other members of the public." 486 U.S. at 40, 108 S.Ct. 1625. But it is likely that few people other than' the police would have been granted the accommodation of having the trash collector segregate all of the respondents' garbage from other garbage. ."A 'seizure' of property occurs when 'there is some meaningful interference with an individual's 1 possessory interests in that property.' ” Karo, 468 U.S. at 712, 104 S.Ct. 3296 (quoting United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). There was at least arguably a seizure here, because, according to the testimony, use of the cell-site simulator may have caused calls appellant tried to make from his phone to drop. (I note that to the extent that the presence of the cell-site simulator in the area caused dropped calls or other disruption of the cell phones of other people in the area, appellant has no standing to complain.) . See also California v. Carney, 471 U.S. 386, 393 n.2, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (“With few exceptions, the courts have not hesitated to apply the vehicle exception to vehicles other than automobiles.”); id. at 392-93, 105 S.Ct. 2066 (explaining that if a vehicle "is readily capable of such use [on the highways] and is found stationary in a place not regularly used for residential purposes," the "justifications for the vehicle exception come into play,” because "the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving”); id. at 392, 105 S.Ct. 2066 ("[I]ndividuals always have been on notice that movable vessels may be stopped and searched on facts giving rise to probable cause that the vehicle contains contraband, without the protection afforded by a magistrate’s prior evaluation of those facts.” (internal quotation marks and alterations omitted)), And, there is exigency , about searching a vehicle where there is probable cause to believe it contains contraband; ”[T]he overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable.” Id. at 393, 105 S.Ct. 2066. . Cf. State v. Tate, 357 Wis.2d 172, 849 N.W.2d 798, 810 (2014) (reasoning that even if a warrant had been required to authorize use of a cell-site simulator, the exact place to be searched, such as a street address, was not required). . Our request for supplemental briefing signaled, without explicitly suggesting, that the automobile exception might be implicated on the facts of this case (and amici briefly addressed its applicability in their initial brief), . See Graham, 824 F.3d at 434 (rejecting the argument that cell-site location information should be treated as "content” for Fourth Amendment purposes). Again, this case does not involve a warrant-less search of any digital content (such as text messages, emails, contact lists, call logs, voi-cemail messages, photographs, videos, files, internet browsing history, apps that are revelatory of a person's interests, historic location information, etc.) stored on appellant's cell phone, the conduct for which, the Supreme Court determined in Riley v. California, — U.S. -, 134 S.Ct. 2473, 2485, 189 L.Ed.2d 430 (2014), a warrant was needed. See id. at 2480-81 (involving a search of the cell phone that was found in Riley’s pocket after he was stopped for driving with expired tags and subsequently arrested for possession of concealed and loaded firearms); see also DOT Policy Guidance at 2 ("[T]he [cell-site] simulator does not remotely capture emails, texts, contact list, images or any other data from the phone."). The seizure, "interfer[ence] with the functioning” of, or “coopt[ing]” of appellant’s phone involved here, including the effect of having his calls dropped, is akin to the interruptions or intrusions that the Riley Court found permissible when police officers execute a search incident to arrest that turns up a cell phone: they are "free to examine the physical aspects of [the] phone,” may "turn the phone off or remove its battery,” or may "leave a phone powered on and place it, in an enclosure that isolates the phone from radio waves.” 134 S.Ct. at 2485, 2487. . In addition, even if I assume arguendo that there was a Fourth Amendment violation, I am doubtful that suppression in this case would "pay its way,” United States v. Leon, 468 U.S. 897, 907 n.6, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), under the "cost-benefit analysis in exclusion cases,” Davis v. United States, 564 U.S. 229, 238, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), particularly in light of the Department of Justice’s announced general policy that the government now must seek warrants for cell-site simulator use, DOJ Policy Guidance at 3-4, "[T]he [exclusionary] rule’s operation [is limited] to situations in which th[e] purpose [of deterrence] is thought most efficaciously served”; accordingly, "[w]here suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted.” Davis, 564 U.S. at 237, 131 S.Ct. 2419 (internal alterations and quotation marks omitted). . Riley, 134 S.Ct. at 2486.